**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

---

MIDWEST UROLOGIC STONE UNIT LIMITED PARTNERSHIP,

Plaintiff,

v.

ALAN H. DOMINA, RICHARD A. CRUSINBERRY, DON L. HENSLEE, PETER E. HOWE, SUSHIL S. LACY, and ANDREW J. LEPINSKI,

Defendants.

Civil No. 01-212 (JRT/FLN)

**ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

---

Richard A. Duncan, Jay D. Christiansen, Elizabeth H. Schmiesing, Karleen M. O'Connor, FAEGRE & BENSON LLP, 2200 Wells Fargo Center, 90 South Seventh Street, Minneapolis, MN, 55402-3901, for plaintiff.

J Jackson, Todd W. Schnell, DORSEY & WHITNEY, Pillsbury Center South, 220 South Sixth Street, Minneapolis, MN, 55402-1498, for defendants.

This matter is before the Court on plaintiff's motion for a preliminary injunction to enforce non-compete agreements defendants signed as a condition of their investment in plaintiff's business.[1] For the reasons that follow, the Court denies plaintiff's motion.

[1] Defendants also move to strike all or portions of the supplemental affidavits of Roland R. Ugarte, M.D. and Charles A. Nystrom on the basis that they were submitted in violation of Local Rules 7.1(b)(1)(A) and 7.1(b)(1)(C). Plaintiff subsequently moved for leave to submit supplementary affidavits out of time. Given the relatively limited opportunity the parties have had to conduct discovery at this stage of the litigation, the Court will grant plaintiff's motion.

FILED FEB 22 2001
FRANCIS E. DOSAL, CLERK
JUDGMENT ENTD. ____
DEPUTY CLERK ____

## FACTS

Plaintiff, Midwest Urologic Stone Unit Limited Partnership ("MUSU"), engages in the business of providing non-physician lithotripsy services to patients of urology health care providers in Minnesota, Wisconsin, Iowa, North Dakota, South Dakota Michigan and Nebraska. Lithotripsy is a method of treating human kidney stones whereby a urologist applies an extracorporeal shockwave to the stone, causing it to disintegrate and pass without incident. Lithotripsy provides patients with a safer, non-invasive alternative treatment to surgery. MUSU currently owns and operates 17 lithotripsy machines, called lithotripters. Ten of MUSU's machines are located at fixed locations while the other seven are installed on trailers and operate at 69 different sites throughout the upper Midwest. MUSU is currently the only supplier of these services in Lincoln, Nebraska.

Defendants are urologists who practice at Urology P.C. in Lincoln, Nebraska. Defendants also have an ownership interest in Pine Lake Associates ASC, LLC d/b/a Urology Surgical Center, an ambulatory surgical center located next to the Urology, P.C. clinic. In 1998, defendants invested in a Class B Limited Interest Investment offering by MUSU.[2] Drs. Domina and Lacy each paid $8,000 to acquire 8 Class B Limited Interests while the other defendants acquired 10 Class B Limited Interests for $10,000.

---

[2] In 1996, two of the defendants, Drs. Domina and Lacy, each purchased 0.2 Class A Limited Interests. Drs. Domina, Howe, Lepinski and Lacy also own one Trust Unit in Midwest Stone Management ("MSM"), MUSU's non-managing general partner. Dr. Lacy has served on MSM's Board of Trustees since 1997, however, he resigned from his position in January, 2001.

As a condition of their investment, each defendant entered into a Non-Compete Agreement (the "Agreement") with MUSU. According to this Agreement, each defendant agreed that he or she would not:

> . . . directly or indirectly, on his, her or its own behalf or in the service of or on the behalf of others, as a director, trustee, owner (except as an owner of less than 5% of the outstanding stock of a publicly-owned corporation), employee, paid consultant, paid advisor, independent contractor or in any other capacity engage in a business that is the same as or essentially the same as the Business (a "Competing Business") or receive any compensation in such capacities, directly or indirectly, from a Competing Business, within a fifty (50) mile radius in each of the locations where the Partnership engages in its Business now or at any time during the term of this Agreement (the "Market Area"). The parties hereto acknowledge and agree that nothing contained in this Agreement shall preclude Investor, or any shareholder, employee, officer, or director of an Investor from providing professional services as a physician to persons.

Non-Compete Agreement ¶ 2.1(a).[3] According to section 2.7 of the Agreement, this non-compete provision "extend(s) through the later of (i) five (5) years from the effective date of this Agreement, or (ii) three (3) years after the Investor's termination of his, her or its interest in the [MUSU]."

Finally, the Agreement contains a provision in which defendants acknowledged and agreed that by virtue of their investment and relationship with MUSU, they would obtain information about MUSU's affairs, business, and operations of MUSU and that any breach of the Agreement would cause MUSU to suffer irreparable loss and injury. Defendants further agreed and acknowledged that the Agreement is designed to protect

[3] The Agreement also contains a non-solicitation provision prohibiting defendants from directly or indirectly soliciting or inducing any person employed by MUSU to leave such employment to work for a competing business. Because issues of fact remain regarding John Haller's departure from MUSU, plaintiff's counsel informed the Court at oral argument that it has set this argument aside until discovery. Thus, for purposes of this motion, the Court's Order focuses on the non-compete provision of the Agreement.

the assets, properties, business and good will of MUSU. *See* Non-Compete Agreement ¶ 2.5.

On January 1, 1999, MUSU began providing lithotripsy services in Lincoln-area hospitals after it purchased Midwest Lithotripter Services.[4] In the spring of 2000, defendants completed construction of the Surgical Center, an ambulatory center which provides patients an alternative location for same-day treatment when hospitalization is not required. In an effort to provide better patient care, defendants discussed the lack of access to lithotripsy services due to MUSU's limited schedule at Lincoln hospitals. In November 2000, defendants assigned Dr. Lepinski to contact MUSU regarding the possibility of obtaining lithotripsy services directly in the Surgical Center.

A meeting between defendants and representatives of MUSU was held on January 3, 2001. The events that transpired from this point forward are largely in dispute and need not be resolved for purposes of this motion. It is clear, however, that about a week following the parties initial meeting, defendants voted to purchase their own lithotripter machine and begin providing services at the Surgical Center. Upon learning of these actions and believing them to breach the non-compete restriction in the Agreement, MUSU filed this lawsuit.

---

[4] Midwest Lithotripter Services was formed in 1989 by three Lincoln hospitals shortly after Nebraska granted approval of such services in the state. The partnership was created in an effort to reduce the cost of providing these services. At that time, the cost of a lithotripter was more than $1 million.

## DISCUSSION

### I. Preliminary Injunction

#### A. Standard of Review

In the Eighth Circuit, a preliminary injunction may be granted only if the moving party can demonstrate: (1) a likelihood of success on the merits; (2) that the movant will suffer irreparable harm absent the preliminary injunction; 3) that the balance of harms favors the movant; and (4) that the public interest favors the movant. *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). Injunctive relief is considered to be a "drastic and extraordinary remedy that is not to be routinely granted." *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed. Cir. 1993). The party requesting the injunctive relief bears the "complete burden" of proving all the factors listed above. *See Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987).

#### B. Irreparable Harm

MUSU fails to sustain its burden of proving it will suffer irreparable harm absent issuance of a preliminary injunction. *See Midwest Systems Inc v. Faulkner,* 1998 WL 252366 at *5 (Minn. Ct. App. 1998) ("A failure to demonstrate irreparable harm is, by itself, sufficient ground for the district court to deny injunctive relief."). Although an inference of irreparable harm may arise from the breach of an otherwise valid and enforceable covenant, *see Air-Vend Inc. v. Barnett,* 1985 WL 4997 at *2 (D. Minn. Dec. 20, 1985), such an inference is not axiomatic. *Energy Solutions Int'l v. Tastad,* 1999 WL 787629 at *3 (Minn. Ct. App. Oct 5. 1999) (unpublished opinion) (emphasizing

that a party seeking an injunction must establish "that a legal remedy is inadequate and that an injunction is necessary to prevent the irreparable injury").[5]

First, the Court is not persuaded that the quality or quantity of information defendants acquired as limited investors in MUSU is sufficient to demonstrate irreparable harm to MUSU. At oral argument, MUSU emphasized the fact that defendants could determine pricing of MUSU's services from the financial information disclosed in the quarterly reports. However, pricing information, in and of itself, is less confidential in this context given that defendants are the referring physicians and would naturally have some idea of the charges incurred for MUSU's services. Additionally, the financial documents defendants received addressed primarily MUSU's operations throughout the Midwest and rarely, if ever, disclosed financial information specific to Lincoln, Nebraska. Further, it is unclear how advantageous the information defendants obtained will be if, as defendants' counsel suggests, pricing is largely predetermined by outside insurance carriers and Medicare.

Dr. Lacy's tenure on MSM's Board of Trustees is somewhat more troubling. However, the nature and extent of information Dr. Lacy obtained in this capacity differs significantly from the information plaintiff received in *Roth v. Gamble-Skogmo, Inc.*, 532 F. Supp. 1029 (D. Minn. 1982). In *Roth,* plaintiff served as defendant's Chief Executive Officer for seven years, during which time he was directly responsible for managing all aspects of defendant's operations. *Id.* at 1030. As CEO, plaintiff made decisions

[5] The inference further depends on the existence of a valid and enforceable covenant, which, at this point, is not entirely clear. *See Air Vend*, 1985 WL 4997 at *2 (declining to draw an inference of irreparable harm where the evidence clearly established that the non-compete covenant was without merit).

concerning hiring, labor relations, sales, financing, long-range and short range planning and served on numerous executive committees. *Id.* These facts stand in stark contrast to Dr. Lacy, whose involvement and access to information on the Board of Trustees was much less extensive.[6]

*Modern Controls Inc. v. Andreadakis,* 578 F.2d 1264 (8th Cir. 1978), a case MUSU relies on in support of its motion, is also distinguishable from the case at bar. There, the defendant made a much stronger showing that plaintiff's unbridled access to the research and development methods and manner of designing defendant's core product would cause it irreparable harm. *Id.* at 1269. It was also clear, unlike here,[7] that defendant made substantial efforts to protect the information plaintiff obtained during the course of his employment. In addition to requiring that plaintiff sign a separate confidentiality agreement, defendant also gave plaintiff periodic reminders of the confidential nature of the information he was obtaining. *Id.* at n.9.

The Court is also not convinced that MUSU's damages are not quantifiable. *See Frank B. Hall & Co. v. Alexander & Alexander, Inc.,* 974 F.2d 1020, 1025 (8th Cir. 1992) (noting that a preliminary injunction is appropriate only where no adequate legal remedy

---

[6] The Court's concern regarding Dr. Lacy's access to and potential misuse of MUSU information is significantly diminished given his recent resignation from the board in January 2001.

[7] MUSU's apparent failure to advise investors of the confidential nature of the information and the fact that potential investors received much the same information as defendants raises a substantial question whether MUSU in fact considered the information confidential. It is also significant that MUSU's actions do not appear to satisfy its own definition of proprietary information in the Agreement. *See* 3.2 Non-Compete Agreement (defining proprietary information to encompass information that is the subject of MUSU's efforts that are reasonable under the circumstances to maintain its secrecy).

exists). MUSU's concern that defendants might later argue that MUSU's damages are less than what MUSU claims because of defendants' ability to refer patients elsewhere is more a dispute over the amount of MUSU's damages than whether MUSU is without **any** adequate remedy at law. Finally, MUSU's reliance on the acknowledgement provisions contained in the Agreement is insufficient, standing alone, to demonstrate irreparable harm. *See Energy Solutions,* 1999 WL 787629 at *3.

In summary, although protection from the unlawful and detrimental disclosure of confidential information can support a finding of irreparable harm sufficient to require the issuance of a preliminary injunction, *see Modern Controls,* 578 F.2d at 1269, the Court is simply not persuaded that under the facts and circumstances of this case, such relief is necessary.

**C. Likelihood of Success on Merits**

This factor does not weigh in favor of one party or the other as it is unclear at this point who will ultimately prevail on the merits. The Court agrees with MUSU that protecting confidential information from disclosure is a legitimate interest employers can rightly protect through reasonably tailored non-compete covenants. *See Roth,* 532 F. Supp. at 1031. The Court further agrees with MUSU that such information need not rise to the level of a protectable trade secret before an employer can contractually protect such information through a restrictive covenant. *Modern Controls,* 578 F.2d at 1268.

Nonetheless, as discussed above, issues concerning the quality, quantity and confidentiality of the information defendants received as investors in MUSU remain unresolved and will be relevant factors for the Court to consider in evaluating the merits

of this case. The Court has additional concerns that the temporal and geographic limitations contained in the agreement are broader than necessary to protect the interests at stake.[8] However, once again, these issues can be more fully addressed once a full review on the merits is before the Court.

**D. Public Interest**

Finally, the public interest considerations clearly weigh against issuing a preliminary injunction in this case at this time. The Court disagrees with MUSU's suggestion that the interests of patient care are red herrings. Although the issuance of an injunction would not completely deprive patients of access to lithotripsy services, the services which are currently available are provided on only a limited basis. Defendants' ability to perform this important health care procedure within their own clinic and on a more frequent basis provides patients with an alternative, more convenient, and arguably, a superior health care option.[9]

---

[8] For instance, although a geographic limitation of 50 miles is generally reasonable, the Agreement here places such restriction on **each** of MUSU's locations. MUSU provides services in over seven states and at 69 locations throughout the Midwest. Additionally, the three-year limitation depends on defendants terminating their interests in MUSU immediately. Otherwise, the time limitation could be much longer.

[9] According to Dr. Howe's affidavit, defendants' ability to provide more expedient treatment of patients will reduce the amount of pain a patient endures and may avoid the necessity for inserting a stent, a device inserted into the ureter from the kidney to the bladder to prevent the ureter from swelling shut.

**ORDER**

Based upon the foregoing, the submissions of the parties, the arguments of counsel and the entire file and proceedings herein, **IT IS HEREBY ORDERED**

1. Plaintiff's motion for a temporary restraining order and/or preliminary injunction [Docket No. 2] is **DENIED.**

2. Defendant's motion to strike plaintiff's supplemental affidavits [Docket No. 25] is **DENIED**.

3. Plaintiff's motion for leave to submit supplementary affidavits [Docket No. 26] is **GRANTED**.

DATED: February 22, 2001
at Minneapolis, Minnesota.

John R. Tunheim

JOHN R. TUNHEIM
United States District Judge